UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HARRISON IGWE,

      Plaintiff,

vs.

THE SALVATION ARMY,

      Defendant.

_____/

Civil Action No. 18-CV-10454

HON. BERNARD A. FRIEDMAN

## OPINION AND ORDER GRANTING
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter is presently before the Court on defendant's motion for summary judgment [docket entry 11]. Plaintiff has responded and defendant has replied. Pursuant to E.D. Mich. LR 7.1(f)(2), the Court shall decide this motion without a hearing.

This is an employment discrimination case. Plaintiff worked for the Salvation Army for many years. From 1985 to 2002, he worked at the Salvation Army Rehabilitation Center in Little Rock, Arkansas, as the program and intake coordinator. Pl.'s Ex. 1. From 2003 until early 2017, plaintiff worked at the Southeast Michigan Salvation Army Adult Rehabilitation Center ("ARC") in Detroit, Michigan, as the director of rehabilitation services ("DRS"), although this position was sometimes referred to as "program director" or "director of programs." *Id.*; Pl.'s Dep. at 26-29. In June 2016, Larry Manzella was appointed as the Detroit ARC administrator to replace the retiring administrator, Merle Miller. Manzella Dep. at 5-6, 17. Manzella believed "[t]here were multiple problems throughout the facility that were readily apparent." *Id.* at 32. Regarding plaintiff, Manzella found "multiple issues" concerning communication, organization, and leadership. *Id.* at 61, 72, 76, 81. In December 2016, Manzella posted the DRS position, and plaintiff applied. *Id.* at

79; Pl.'s Dep. at 74-75; Def.'s Ex. Q. In January 2017, Manzella (and his boss, Charlene Polsley) interviewed plaintiff, Pl.'s Dep. at 84, but the position was offered to another candidate, Lynne Williams. Manzella Dep. at 83. Defendant terminated plaintiff's employment effective March 3, 2017, on the grounds that his position had been eliminated. Pl.'s Dep. at 118; Manzella Dep. at 111; Pl.'s Ex. 15.

Plaintiff, who is "an African-American man of Nigerian origin, and is currently 65 years of age," Compl. ¶ 6, alleges that defendant discriminated against him based on his race (Count I), his national origin (Count II), and his age (Count III), in violation of Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act ("ADEA"). He alleges that his race, national origin, and age were all "factor[s] that made a difference in Defendant's decision to subject him to the wrongful and discriminatory treatment described above." *Id.* ¶¶ 22, 29, 36. For relief, plaintiff seeks damages, costs, interest, attorney fees, and reinstatement.

Because plaintiff has presented no direct evidence of discrimination,[1] all of his claims

---

[1] A plaintiff who presents direct evidence of discrimination bypasses the *McDonnell Douglas* burden-shifting framework. Direct evidence is "that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999). The five incidents plaintiff points to as "direct evidence of discrimination," Pl.'s Br. at 14, do not meet this test: (1) Manzella's statement that plaintiff's "broken speech has also made it difficult to communicate with him at times," Pl.'s Ex. 7, is not direct evidence of national origin discrimination, but a comment regarding plaintiff's ability to communicate orally. The Court notes that during plaintiff's deposition, the court reporter asked plaintiff a number of time to repeat himself, as she had difficulty understanding him. *See, e.g.,* Pl.'s Dep. at 38, 60, 64, 67, 92, 146, 152, 158. (2) Manzella's quotation, as part of a devotional during a staff meeting, of a Bible verse using the word "slave," *see* Compl. ¶ 14, Pl.'s Ex. 16, is not evidence of race discrimination, either direct or circumstantial. (3) The fact that "many other African American employees, including department heads, were terminated throughout 2017" is not by itself evidence of race discrimination, either direct or circumstantial, absent evidence of the circumstances of the terminations. The only evidence in the record concerning these terminations is found in Manzella's testimony where he indicated that four African-American

are analyzed under the familiar burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). If plaintiff presents a prima facie case of discrimination, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the treatment at issue. If the employer does so, the burden shifts to the employee to show that the stated reason is unworthy of belief. The matter is for a jury to resolve if the evidence regarding the legitimacy of the employer's explanation is sufficiently disputed.

### Race and National Origin Discrimination Claims

In Counts I and II of the complaint, plaintiff claims that he was not hired for the DRS position, and that he was discharged soon thereafter, because of his race and national origin. To state a prima facie case, plaintiff must show "(1) membership in the protected class; (2) that he . . . suffered from an adverse action; (3) that he . . . was qualified for the position; and (4) that he . . . was treated differently from similarly situated members of the unprotected class." *Alexander v. Local 496, Laborers' Int'l Union of N. Am.*, 177 F.3d 394, 402-03 (6th Cir. 1999). Defendant appears to concede that plaintiff has stated a prima facie case of race and national origin discrimination. Plaintiff is African-American and of Nigerian origin. He was not hired for the DRS position, and he was later discharged. He was, by Manzella's admission, qualified for the position.

---

employees were terminated at unspecified times (Thompson, Muse, McSpadden, and Coffee) and he explained the reasons in each case (yelling at supervisor, stealing food, stealing toys, and poor judgment). Manzella Dep. at 113-15. (4) Manzella's boss, Charlene Polsley, allegedly asked plaintiff during his interview whether he is a U.S. citizen or has a green card. *See* Compl. ¶ 13; Pl.'s Dep. at 84. Plaintiff has cited no authority suggesting that this question, by itself, is evidence of national origin discrimination, either direct or circumstantial. (5) The fact that another director, who is Caucasian (Bob Idzior or Idizor), "was not disciplined," Pl.'s Br. at 14, is evidence of nothing absent a showing, which plaintiff has not made, that he and plaintiff were comparable in all relevant respects. Notably, plaintiff does not allege that he ever heard anyone at the Salvation Army comment negatively about his race, national origin, or age.

And a Caucasian American was hired instead of plaintiff.

As defendant concedes that plaintiff has stated a prima facie case, both sides focus on defendant's stated reasons for not hiring plaintiff, and for discharging him, and on whether plaintiff has shown that these reasons were pretextual. "A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000).

Defendant's stated reason for not hiring plaintiff was, in essence, that he lacked leadership and communication skills and that he had allowed the counselors under his supervision to focus on clinical counseling as opposed to spiritual counseling, the latter being "the mission of the Army." Manzella Dep. at 38-39, 47-50, 61, 63, 72, 76-77. Manzella indicated that the Detroit ARC was "[t]he only center in the 11 central states whose program had turned clinical like ours and had gotten away from its original mission." *Id.* at 57. Manzella conceded that plaintiff was well qualified for the DRS position in terms of his education, but he took issue with plaintiff's "lack of leadership, the lack of follow-through, the lack of being able to communicate and give direction." *Id.* at 81. Manzella testified that under plaintiff's directorship "[t]here was no leadership" and that plaintiff "wasn't effective at all as a DRS or a director of program." *Id.* at 76-77. These are clearly legitimate, non-discriminatory reasons not to hire (or in this case, rehire) plaintiff for this position.

The Court has carefully read plaintiff's response to defendant's motion, as well as all of the deposition testimony and other exhibits. Despite viewing the evidence in the light most favorable to plaintiff and giving him the benefit of all reasonable inferences, the Court cannot find that there is a triable issue as to pretext. Plaintiff conceded that he has no training in spiritual

counseling, Pl.'s Dep. at 23-24, although he supervised all of the counselors, *id.* at 36, and he does

not challenge Manzella's testimony that such counseling is part of the Salvation Army's mission.

Moreover, nothing in plaintiff's deposition testimony or in any of plaintiff's exhibits contradicts

Manzella's criticisms of plaintiff's leadership and communication skills.[2]

_____

[2] Regarding plaintiff's poor communication skills, Manzella testified:

> Communication was terrible. . . . When you ask somebody a question, you're looking for some type of response, whether it's positive or negative, something. Conversations with Dr. Igwe were one-sided. They were yes, okay, yes. Trying to get information from him was very difficult. I'll give you an example. We have a board meeting and we have all the directors sitting around the table and one by one they give their report, extensive reports about what's going on in their department. When it comes to Dr. Igwe, what's happening with your program? Silence. It's good. It's good. The numbers are coming down, can you explain why? Gets up, runs out of the room, goes and get somebody to come back and answer the question. There is nothing there. No response, conversation after conversation. It's just the way it was.

Manzella Dep. at 47-48. Manzella testified that when he asked plaintiff specifically about the "house count," "[t]here was no response. . . . Sat there, smiled and said okay, okay. Very short. One word." *Id.* at 50. Regarding plaintiff's lack of leadership, Manzella testified about "chaos" at the ARC and that

> a lot of it happened under [plaintiff's] watch, his counselors whom he was responsible for. I mean, that's where the meat of this comes from. He was responsible for his staff and his staff was not performing, not following directions, not communicating.

> \*   \*   \*

> Not supervising, decisions were not going through him, counselors were doing their own thing, for lack of a better way to put it. Just chaos, disorganization, miscommunication.

> \*   \*   \*

> The problem was not with the education. The problem is what you

Plaintiff makes much of the fact that he was more qualified for the job than Williams because he has a master's degree in rehabilitation counseling and a Ph.D. in human services, while Williams has a bachelor's degree in English.  *See* Pl.'s Exs. 1, 11.  As noted above, however, Manzella agreed that "if you look at his education, he absolutely is qualified. . . . Anybody would love to have somebody with his quality and his level of education."  Manzella Dep. at 81.  However, in Manzella's judgment plaintiff's superior educational qualifications were outweighed by his failings in leadership and communication.[3]  Manzella was concerned about Williams not having attained a master's degree, as the job description required, *see* Def.'s Ex. Q, but he obtained permission from his superior, Arnel Ruppel, "to consider an individual with a bachelor's degree."  Def.'s Ex. R.  Therefore, while plaintiff had superior educational qualifications, he has not shown

---

> do with the education.  The lack of leadership, the lack of follow-through, the lack of being able to communicate and give direction. . . . I'm talking about him being qualified hands-on, yeah, walking into people's office, closing the door and say, hey, look we are not doing business this way instead of passively, you know, letting things go by.

*Id.* at 63, 72, 81-82.  This testimony is unrebutted.

[3] In contrast, after interviewing Williams and after observing her at work at another Salvation Army location in Romulus, Michigan, Manzella made the following comments about her:

> Willingness to take[] on added responsibilities
> Contributes in Discussions, good insight
> Has an agreeable personality and works well with others
> Appears to respond well to stressful situations
> Shows necessary leadership skills in current role at Romulus Campus.
> Wants to learn . . . passion for doing things right.
> Understands our Mission and is willing to share her faith with others.
> Strongly committed to maintaining SA polic[i]es

Def.'s Ex. M.

that he was the superior candidate overall or that Williams was not qualified for the DRS position.

"So long as its reasons are not discriminatory, an employer is free to choose among qualified candidates, . . . [and] [a]n employer has even greater flexibility in choosing a management-level employee . . . because of the nature of such a position." *Wrenn v. Gould*, 808 F.2d 493, 502 (6th Cir. 1987). On this record, there is simply no genuine issue of material fact as to the legitimacy of the reasons defendant has offered for not hiring plaintiff for the DRS position. Defendant is therefore entitled to summary judgment insofar as plaintiff's race and national origin discrimination claims are based on defendant's decision not to hire him for the DRS position.

Plaintiff also claims that defendant discriminated against him on these bases when it discharged him. But the discharge decision was the natural consequence of (1) defendant's decision to hire Williams for the DRS position, and (2) plaintiff's decision not to interview for any other position. Plaintiff acknowledged that Manzella intended to eliminate plaintiff's "program director" position and to fold the responsibilities of that position into the new DRS position. Pl.'s Dep. at 75, 78; Manzella Dep. at 88. Indeed, the "termination report" Manzella signed on March 1, 2017, states "elimination of position" as the reason for plaintiff's discharge. Therefore, when Williams was appointed to the DRS position, plaintiff was out of a job.

At the staff meeting when Manzella announced Williams' appointment, plaintiff heard Manzella say that everyone who wanted a job must interview with Williams. Pl.'s Dep. at 95-96, 98, 139-40. However, plaintiff was not interested in any other jobs because he considered them to be "entry level," and he refused to be interviewed by Williams because she had been his subordinate and was "not qualified to be my boss." *Id.* at 105-108. In fact, plaintiff indicated that he was above reporting to Williams "because not qualified" [sic] and that he would not report to her.

*Id.* at 105-106.  Under these circumstances, defendant had no choice but to discharge plaintiff because he was interested only in the DRS position, *id.* at 108, and that position had been given to Williams.

The Court concludes that defendant is entitled to summary judgment on plaintiff's race and national origin claims.  Defendant has articulated a legitimate, non-discriminatory reason for not offering the DRS position to plaintiff and for discharging him, and plaintiff has not presented sufficient evidence of pretext to warrant submission of the case to a jury.

*Age Discrimination Claim*

In Count III of his complaint, plaintiff claims that defendant discriminated against him based on his age in violation of the ADEA.  Plaintiff was 63 years old when defendant hired Williams for the DRS position and when defendant discharged plaintiff.[4]  *See id.* at 162.  Plaintiff does not challenge defendant's assertion that during this time Williams was 56 years old.  *See* Def.'s Br. at 23.

The *McDonnell Douglas* burden-shifting framework is used to analyze age discrimination claims, just as it is used to analyze race and national origin discrimination claims, when, as here, plaintiff has no direct evidence of discrimination.  The Sixth Circuit has explained:

> To establish a prima facie case of age discrimination, a plaintiff must show: "(1) membership in a protected group; (2) qualification for the job in question; (3) an adverse employment action; and (4) circumstances that support an inference of discrimination." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). An allegation that the plaintiff was replaced by a younger individual supports an inference of

_____

[4] Plaintiff testified that his birth date is 6-25-53.  Pl.'s Dep. at 162.  Therefore, he was 63 years old in January 2017 (when Williams was hired for the DRS position) and in March 2017 (when plaintiff was discharged).

discrimination only if the difference in age is significant. *See Grosjean v. First Energy Corp.*, 349 F.3d 332, 336 (6th Cir. 2003) (explaining that an inference of discriminatory intent cannot be "drawn from the replacement of one worker with another worker insignificantly younger" (internal quotation marks omitted)).

*Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283 (6th Cir. 2012). Further,

> This court established a bright-line rule in *Grosjean* when it held that "in the absence of direct evidence that the employer considered age to be significant, an age difference of six years or less between an employee and a replacement is not significant." *Id.* at 340. However, while an age difference of ten or more years is generally considered significant, *id.* at 336, replacement of the employee by a person who is six to ten years her junior must be considered on a case-by-case basis. *Cf. id.* at 340 (explaining that bright-line rule "does not encroach on our precedent holding that eight years can be a significant age difference"). Thus, *Grosjean* essentially created a zone of discretion in age-discrimination cases involving replacement by a person who is between six and ten years younger than the plaintiff.

*Id.* at 284.

The seven-year age difference in the present case is not, by itself, sufficiently significant to support an inference of age discrimination. While the Sixth Circuit has recognized a "zone of discretion" when the age difference is between six and ten years, it noted in *Grosjean* that "the overwhelming body of cases in most circuits has held that age differences of less than ten years are not significant enough to make out the fourth part of the age discrimination prima facie case." 349 F.3d at 338. This section of the *Grosjean* opinion catalogued a number of cases from around the country, including within the Sixth Circuit, in which age differences of between seven and nine years were deemed insignificant for purposes of stating a prima facie age discrimination case. *See id.* In one of the cited cases, *Black v. Columbus Pub. Sch.*, 124 F. Supp. 2d 550, 574 (S.D. Ohio 2000), the court found that plaintiff failed to state a prima facie case of age discrimination because

the age difference between her and her replacement was seven years. The Sixth Circuit affirmed this ruling because plaintiff "failed to show that the person hired was substantially younger than she was, as the person chosen was only seven years younger." *Black v. Columbus Pub. Sch.*, 79 F. App'x 735, 738 (6th Cir. 2003). The Sixth Circuit's decisions in *Blizzard* and *Grosjean* clarify that a seven-year age difference might suffice depending on the circumstances of a particular case. In the present case, however, the Court finds that this age difference does not suffice because it is very close to the six-year "cutoff" that the Sixth Circuit has held to be insignificant as a matter of law and plaintiff has presented no other evidence to support his age discrimination claim:

> Q. Why do you think that you were discriminated [against] based on
> your age?
> A. Because the position was given to [a] younger person.
> Q. Okay. Anything else?
> A. That's it.

Pl.'s Dep. at 162.

Defendant is entitled to summary judgment on plaintiff's ADEA claim because plaintiff has not stated a prima facie case of age discrimination. Even if plaintiff had stated a prima facie case, defendant would be entitled to summary judgment because plaintiff has not presented evidence from which a jury could find in his favor on the issue of pretext.

*Conclusion*

For the reasons stated above,

IT IS ORDERED that defendant's motion for summary judgment is granted.

s/Bernard A. Friedman
Dated:  December 20, 2018          BERNARD A. FRIEDMAN
Detroit, Michigan                       SENIOR UNITED STATES DISTRICT JUDGE